IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 27, 2022

FILED
12/15/2022
Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. KEVIN DEWAYNE STINNETT**

**Appeal from the Circuit Court for Marshall County**
**No. 2020-CR-101    M. Wyatt Burk, Judge**
_____

**No. M2021-01266-CCA-R3-CD**
_____

A Marshall County Circuit Court jury convicted the Defendant-Appellant, Kevin Dewayne Stinnett, of possession of heroin with the intent to sell or deliver, possession of .5 grams or more of cocaine with the intent to sell or deliver, simple possession of methamphetamine, simple possession of marijuana, and possession of drug paraphernalia, and the trial court imposed an effective sentence of eighteen years' incarceration. See Tenn. Code Ann. §§ 39-17-417(a)(4), -418(a), -425(a)(1). On appeal, Stinnett argues: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred in denying his motion to continue his trial; and (3) the trial court erred in imposing partially consecutive sentences and in denying an alternative sentence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., P.J., and ROBERT W. WEDEMEYER, J., joined.

William C. Barnes, Jr., Columbia, Tennessee, for the Defendant-Appellant, Kevin Dewayne Stinnett.

Jonathan Skrmetti, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and William Bottoms and Lee Brooks, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

In October 2020, the Marshall County Grand Jury indicted Stinnett for possession of heroin pills with the intent to sell, possession of heroin with the intent to sell or deliver, possession of .5 grams or more of cocaine with the intent to sell or deliver, possession of .5 grams or more of methamphetamine with the intent to sell or deliver, simple possession of marijuana, and possession of drug paraphernalia.

**Trial.** We have briefly summarized the evidence presented at Stinnett's May 17-18, 2021 trial that is relevant to the issues he raises on appeal. On May 20, 2020, the 17th Judicial District Task Force executed a search warrant at Stinnett's home in Lewisburg. After knocking and announcing their presence several times, the officers entered the home through the unlocked front door. At the time, Stinnett was sitting on the "far left-hand side of the couch." The officers immediately took Stinnett into custody and detained the other family members present while they conducted a search of the house.

During this search, officers found a "small black box" containing what appeared to be marijuana residue and some syringes on the coffee table in the living room as well as a "straw with residue" on the living room floor. They also found "rolling papers" and aluminum foil with "a white crystalline substance" on top in the living room. Inside a lockbox underneath the coffee table, officers found digital scales, "plastic baggies," "a green plant material" that appeared to be marijuana in a Ziploc bag, a brown piece of paper containing white powder, and numerous multicolored pills that appeared to be "ecstasy." Agent Shane George, who assisted in executing this search warrant, testified that digital scales and plastic baggies "typically are possessed and employed by drug distributors" to weigh and package small amounts of drugs for resale. He also stated that he was able to identify the "green plant material" by smell as marijuana. All of this evidence was located on or near the coffee table next to where Stinnett was sitting on the couch. The lockbox, where the majority of the drugs were located, "was positioned right next to where Mr. Stinnett was [sitting] in the house" and the keys to the lockbox were "sitting next to [Stinnett]." Officers also found a glass pipe, a "glass bong," and a "marijuana grinder" in the back bedroom that had both male and female clothing in it. Officers also uncovered a Motorola cell phone as well as $400 in Stinnett's wallet.

Forensic testing by the Tennessee Bureau of Investigation (TBI) determined that the "white powder" contained .88 grams of cocaine; the "off-white powder," which weighed .48 grams, contained heroin, fentanyl, 4-ANPP,[1] and methamphetamine; and the "off-white-and-brown powder," which weighed 7.75 grams, contained heroin, fentanyl, and 4-ANPP. The TBI did not perform "purity testing" on either of the mixed substances to determine the specific amount of each drug within the mixture because such testing was not within the "TBI's current scope." In addition, the TBI did not test the pills that were submitted because of TBI's policies, and the TBI did not test the marijuana-like substances because they were never submitted by law enforcement. The amounts of the powder substances were consistent with the sale of drugs rather than the personal use of drugs.

---

[1] "4-ANPP" is an abbreviation for 4-anilino-N-phenethyl-4-piperidine.

Officers interviewed Stinnett at his home, and an audio recording of this interview was admitted into evidence at trial. On this recording, Stinnett waived his <u>Miranda</u> rights and agreed to talk to the officers. Stinnett admitted that he smoked marijuana daily but denied using ecstasy or heroin and claimed that it had "been awhile" since he last used methamphetamine. He said Stephanie Lee had lived at his home for two or three months before his mother made her leave two days prior. Stinnett explained that he knew Lee through his cousin, that Lee and his cousin had both been homeless, and that Lee had temporarily lived at his house. Stinnett claimed that the lockbox containing drugs near the couch in the living room had belonged to Lee and that Lee had gotten her drugs from a black guy named "Rob" in Spring Hill whose home was located "right off Saturn Parkway." Stinnett acknowledged that he had gone with Lee to meet her drug dealer three times. He also said he had keys to the lockbox because he had agreed to help Lee by selling some of the drugs for her. Stinnett acknowledged that he communicated with Lee over Facebook Messenger and also texted with someone he identified as "West Hill." While Stinnett initially denied owning a cell phone, he eventually admitted to officers that the Motorola cell phone belonged to him, and he provided the passcode for this phone and consented to a search of it. Stinnett maintained that Lee also knew the passcode to his cell phone and that she used his cell phone when she stayed at his home.

Stinnett's Facebook messages with Stephanie Lee, which were admitted at trial, confirmed that they both used drugs and worked together to sell drugs. These messages referenced the drug dealer named "Rob" as well as "powder," "up," and "[s]uboxone." In addition, Stinnett discussed drug prices with Lee, stating, "[W]hite girls going for 100 a g." He also said that he "got someone a ball of that girl and got some wood . . . Gorilla glue and strawberry diesel." Stinnett advised Lee that "[s]hit went fast" and told Lee to "let Brad know that I'll have some H 25 a point[.]"

Stinnett also told Lee that a dealer was "coming" to him and that he was "getting a little bit of everything white girl & H & wood and 20 x beans." Lee asked Stinnett for "a ball of that h and a couple of those beans," and then said, "I'll go to a friend's and help get rid of that h real easy real quick and we can even tell him u let me get it or whatever but I'll give u back what he always charges me for it and I'm sure u will still b making some off of it . . . ."

In other messages, Lee asked Stinnett what the "beans" looked like "out of the bag," and Stinnett sent her a photograph of the drugs. Lee also told Stinnett to keep the "h" in foil because it will "eat" through "plastic," and she instructed him to "weigh it out and sep[ar]ate it by half gs." Later, Stinnett told Lee that someone had brought him "quite a bit" of drugs, describing it as a "qrt" and that he had offered someone "5 of H to help [him] out." Stinnett told Lee that he was taking "one of these beans" and the next day said that he was "[j]ust coming down off that x pill[.]" In response to Lee's requests for drugs,

Stinnett told Lee, "[W]e can both make money but I can[']t take no losses and I can't just hand you something everyday[.]"  In other Facebook messages, Lee asked Stinnett the price of a "ball of . . . [d]own" and then asked Stinnett for her "skates."

Stinnett's cell phone also contained numerous text messages to someone identified as "West Hill" regarding drugs, and these text messages were also admitted at trial.  Stinnett and West Hill exchanged several texts about Stinnett's getting directions to West Hill's apartment because he had always come with "Steph" in the past.  West Hill told Stinnett he "got some x"[2] and asked Stinnett not to forget about the "perks[.]"[3]  Stinnett replied that he had talked his mom "into coming off 10 of them for 100[,]" and confirmed that his "ticket was 350."  That night, Stinnett advised West Hill that he had "already sold out [of] everything[,]" including "wood[,]" and that he had "the bread"[4] but did not have transportation to come see West Hill until the next afternoon.  When Stinnett asked about the "beans," West Hill stated, "[J]ust tell me what u want on the menu[.]"  Stinnett then replied, "Same as I got last round . . . half of the girl,[5] half zipper of wood,[6] few of them beans[7] if possible."  When West Hill offered to come to Stinnett's home, Stinnett provided his address and then stated, "[C]an you make it a whole zip of wood[,] half z[i]p of the girl[,] few of them[?]"  When Stinnett asked about "the ticket," West Hill" replied, "20[]beans zip of wood 7 of the girl[8] that will be 600 so the rest will be 460" and then said he was "getting low on the girl."  Stinnett responded, "Yeah I know I'm trying to move your [drugs] pretty fast[.]  [Y]ou going to see her again because she's in high demand[.]"[9]

Later, Stinnett and West Hill talked about the availability of drugs and drug prices. Stinnett mentioned that the "ball game of up"[10] was now "150" even though it had been

_____

[2] Agent Shane George referenced many of Stinnett's text messages and provided extensive testimony regarding the meaning of the following slang terms or phrases.  He explained that "x" is slang for the drug ecstasy.

[3] "[P]erks" is slang for the controlled prescription pain medication Percocet.

[4] "[B]read" is slang for "cash money."

[5] "[G]irl" is slang for heroin.  In addition, given the price Stinnett mentioned, a "half a girl" is one-half of an ounce of heroin.

[6] "[H]alf a zipper of wood" is slang for one-half an ounce of marijuana.

[7] "[B]eans" is slang for the drug ecstasy.

[8] "7 of the girl" is slang for 7 grams or one-quarter of an ounce of heroin.

[9] This statement is slang for "[a]re you going to be getting more heroin because [it's] in high demand."

[10] "[U]p" is slang for methamphetamine.  "[B]all game of up" is slang for an eight ball or one-eighth ounce of methamphetamine, and the "150" and "90 to 100" refers to the price for that amount of the drug.

"90 to 100." He also said he had a "few people ask about H."[11] West Hill told Stinnett that he gave him the "wrong pack of pills." Stinnett asked if West Hill had talked to "Stephanie" because she had asked him "to front her something," and Stinnett told her she would have to ask West Hill first. He told West Hill about the number of "beans" he had in his possession, the "high demand" for "the white girl[]," and that he had "7 in H[,] 12 xp[,] and 12gs of smoke." Stinnett also said he had "4 Suboxone" in pill form and that they could "work something out" if West Hill "want[ed] them[.]" He also said he could not "locate perks" and then he and "West Hill" discussed exchanging drugs to reduce the amount of money Stinnett owed him.

Stinnett also told West Hill, "[Stephanie] was trying to get my keys [to] my lockbox[.] I checked it thank God everything still there[.] [G]ot a pretty good bit of H[,] quite a few extra[,] I haven't counted everything yet . . . ." In his last message to West Hill, Stinnett asserted, "I've got 10gs of H left[,] 20 xps[,] almost out of wood[,] 2gs of girl[,] $400 in bread[,] so far it's slow[ed] down on the H[,] the x was going now[,] it seems like we're stuck with them."

At the beginning of the second day of trial, defense counsel moved for a continuance of the trial on the basis that Stinnett was receiving treatment for his broken ribs. The State objected, and the trial court denied the motion, stating that Stinnett's absence was voluntary because he had known about his injury twenty-five days earlier and had delayed obtaining medical treatment until the night before his second day of trial.[12]

After the State rested its case-in-chief, the trial court granted the defense's motion for judgment of acquittal on the charge of possession of heroin pills in Count 1 because the State failed to present any proof that the pills, which were never tested by the TBI, contained heroin.

At the conclusion of the trial, the jury convicted Stinnett in Count 2 of possession of heroin with the intent to sell or deliver, in Count 3 of possession of .5 grams or more of cocaine with the intent to sell or deliver, in Count 4 of the lesser included offense of simple possession of methamphetamine, in Count 5 of simple possession of marijuana, and in Count 6 of possession of drug paraphernalia. Following a sentencing hearing, the trial court imposed an effective sentence of eighteen years in incarceration.

---

[11] "H" is slang for heroin. "A point" of heroin is slang for a syringe that is preloaded with one-tenth of a gram of heroin and typically sells for between $20 and $40.

[12] We have included the trial court's detailed findings denying this motion in the analysis section.

Thereafter, Stinnett filed a timely motion for new trial, arguing that the evidence was insufficient to sustain his convictions, that the trial court erred in denying his motion to continue the trial, and that the trial court improperly sentenced him to consecutive sentences. The trial court entered a September 10, 2021 order[13] denying the motion, stating that after reviewing "the record, the Court's notes, testimony and arguments of counsel, the Court finds the Motion for New Trial not to be well taken and the same is hereby denied." On September 16, 2021, the trial court entered a second order[14] entitled "Order Overruling Motion for New Trial, Appointing Counsel on Appeal and Directing Transcription of Hearings." In it, the trial court held that Stinnett's "Motion for New Trial is overruled, that [defense counsel] is appointed to represent [Stinnett] on appeal, and that the Court Reporter is directed to transcribe [the relevant portions of the record][.]" On October 19, 2021, Stinnett improperly filed a notice of appeal in the Marshall County Circuit Court Clerk's office,[15] and on October 25, 2021, he filed an untimely notice of appeal in the Appellate Court Clerk's office.

## ANALYSIS

Although the State asserts that the Defendant filed an untimely notice of appeal, it does not argue that the Defendant's appeal should be dismissed on that basis. Even if we give Stinnett the benefit of the second order denying the motion for new trial that was entered on September 16, 2021, Stinnett, who had the assistance of appointed counsel, still filed his notice of appeal nine days late. Moreover, Stinnett, through counsel, failed to acknowledge that his notice of appeal was untimely, failed to provide an explanation for why his notice of appeal was untimely filed, and failed to request a waiver of the timely filing requirement. Consequently, this court came extraordinarily close to dismissing Stinnett's appeal, particularly in light of the recent trend of dismissing appeals under similar circumstances. In any case, so that Stinnett's issues can be heard, we reluctantly conclude that the "interests of justice" merit a waiver of the untimely notice of appeal. See Tenn. R. App. P. 4(a).

**I. Sufficiency of the Evidence.** Stinnett makes only a very general challenge to the sufficiency of the evidence presented at trial. In response, the State notes that Stinnett

---

[13] The September 10, 2021 order was signed by defense counsel and the State.

[14] The September 16, 2021 order was also signed by defense counsel and the State.

[15] See Tenn. R. App. P. 3(e) ("An appeal as of right to the Supreme Court, Court of Appeals, or Court of Criminal Appeals shall be taken by timely filing a notice of appeal with the clerk of the appellate court as provided in Rule 4 and by service of the notice of appeal as provided in Rule 5.") (emphasis added); Tenn. R. App. P. 4(a) ("In an appeal as of right to the Supreme Court, Court of Appeals or Court of Criminal Appeals, the notice of appeal required by Rule 3 shall be filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from; however, in all criminal cases the "notice of appeal" document is not jurisdictional and the timely filing of such document may be waived in the interest of justice.") (emphasis added).

- 6 -

failed to specifically articulate why the evidence is insufficient to sustain any of his convictions but nevertheless argues that the evidence is "more than sufficient" to support Stinnett's convictions. We conclude that Stinnett has waived this issue and, in any case, is not entitled to relief.

Initially, we agree that Stinnett has failed to state why the evidence is insufficient to sustain his convictions. In addition, Stinnett has failed to cite the relevant law for this issue and has failed to reference the portions of the trial record that support his claim. Accordingly, we conclude that Stinnett has waived his insufficiency claim. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also Tenn. R. App. P. 27(a)(7)(A) (A brief shall contain "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]"). However, in light of the seriousness of Stinnett's felony convictions, we will briefly address this issue on the merits.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the

sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). Possession of heroin with the intent to sell or deliver is a Class B felony. Id. §§ 39-17-417(b), 39-17-406(c)(11). Possession with the intent to sell or deliver 0.5 gram or more of any substance containing cocaine is also a Class B felony. Id. § 39-17-417(c)(1). "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Id. § 39-17-419.

It is a Class A misdemeanor "for a person to knowingly possess or casually exchange a controlled substance, unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice." Id. § 39-17-418(a), (c)(1). Methamphetamine and marijuana are controlled substances. Id. §§ 39-17-408(d)(2), -415(a)(1). It is also a Class A misdemeanor "for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance . . . ." Id. § 39-17-425(a).

A person may possess contraband alone or jointly with others. State v. Copeland, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). In addition, "[p]ossession may be actual or constructive." State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)). Constructive possession is established when a person has "'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting United States v. Craig, 522 F.2d 29, 32 (6th Cir. 1975)). It has also been defined as "'the ability to reduce an object to actual possession.'" Id. (quoting United States v. Martinez, 588 F.2d 495, 498 (5th Cir. 1979)).

At the motion for new trial hearing, the trial court "reaffirm[ed] its findings that there was overwhelming evidence of [Stinnett's] guilt" for all of the conviction offenses. We agree that the proof presented at trial compellingly established that Stinnett knowingly possessed with the intent to sell or deliver heroin and .5 grams or more of cocaine, that Stinnett knowingly possessed methamphetamine and marijuana, and that Stinnett possessed drug paraphernalia. Inside Stinnett's home, the drug task force discovered a white powder containing .88 grams of cocaine, a second powder mixture containing heroin

and methamphetamine, and a third powder mixture containing heroin. While the amount of heroin and methamphetamine in the last two mixtures was not determined by the TBI, no specific amount of these controlled substances is required for the respective convictions. In addition, no specific amount of marijuana is required to be guilty of simple possession of marijuana. Agent George identified the green, plant-like substance in Stinnett's home by smell as marijuana. Although the identity of this substance was not confirmed through TBI testing, Agent George's testimony, as well as Stinnett's admission to using marijuana daily, was more than sufficient for the jury to find that this substance was, in fact, marijuana. During the recording of his interview, Stinnett admitted to officers that he was helping Lee sell these drugs. In addition, a key to the lockbox, which contained most of the drugs in the house, was found next to Stinnett, and his text messages confirmed that the lockbox of drugs belonged to him and that he was actively engaged in selling and delivering drugs.

Regarding Stinnett's drug paraphernalia conviction, officers found digital scales, syringes, aluminum foil, a straw with residue, plastic baggies, a glass pipe with residue, a glass bong, and a marijuana grinder. Stinnett admitted that he used marijuana every day, and his text messages included numerous references to his weighing and packaging drugs for sale. All of the controlled substances as well as the digital scales, syringes, aluminum foil, straw with residue, and plastic baggies were found in the living room near where Stinnett was sitting when the drug task force entered his home, and the glass pipe with residue, a glass bong, and a marijuana grinder were found in a bedroom at the back of the home that contained men's and women's clothes.

Given all of this proof, a rational jury could have found that Stinnett knowingly possessed with the intent to sell or deliver heroin and .5 gram or more of cocaine, knowingly possessed methamphetamine and marijuana, and possessed with the intent to use drug paraphernalia. Because the evidence is sufficient to sustain all of Stinnett's convictions, he is not entitled to relief.

**II. Continuance.** Next, Stinnett contends that the trial court deprived him of the right to be present at his own trial by denying his motion for a continuance the morning of the second and final day of trial. He claims that his doctor gave him an excuse not to attend his trial because of his broken ribs. He also asserts that his presence at trial was not waived by flight or escape. The State responds that because Stinnett unilaterally elected to receive medical care for an injury he sustained weeks prior to trial rather than appear for the last day of his trial, the trial court properly exercised its discretion to deny Stinnett's motion for a continuance, and this denial did not violate Stinnett's constitutional rights. We conclude that because Stinnett waived his right to be present for the second and final day of trial, he is not entitled to relief.

Both the United States Constitution and the Tennessee Constitution guarantee a defendant the fundamental right to be present at his or her own trial. U.S. Const. amend. V, XIV, § 1; Tenn. Const. art. I, § 9; see State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998). This right to be present applies to the arraignment, every stage of the trial including the impaneling of the jury and return of a verdict, and the imposition of a sentence. Tenn. R. Crim. P. 43(a)(1)-(3). However, this right is not absolute because "further progress of the trial, to and including the return of the verdict and imposition of sentence, shall not be prevented[.]" Tenn. R. Crim. P. 43(b) (emphases added). The right to be present at trial may be waived by the defendant's voluntary absence or in-court disruptive conduct. Tenn. R. Crim. P. 43(b)(1), (2); see Muse, 967 S.W.2d at 767. As relevant here, "the defendant shall be considered to have waived the right to be present whenever a defendant, initially present . . . [v]oluntarily is absent after the trial has commenced, whether or not he or she has been informed by the court of the obligation to remain during the trial[.]" Tenn. R. Crim. P. 43(b)(1).

The record shows that Stinnett was present the entire first day of his trial. However, prior to the start of the second and final day of trial, Stinnett did not appear, and his attorney made an oral motion to continue the trial. Defense counsel explained that around 8:30 p.m. the previous night, Stinnett sent him a text message that "he was in the Maury County emergency room; that he had been diagnosed with broken ribs; [and] that they had put him on pain medication." Defense counsel said he told Stinnett that "he needed to appear" at trial this morning and needed to "bring with him those medical records," and Stinnett responded that he would fax or forward the medical records to the clerk's office. The State opposed the motion to continue trial, asserting that Stinnett had originally sustained this injury approximately twenty days prior and had delayed treatment until the night before the second day of his trial. The State also argued that pursuant to Rule 43, the court could proceed with the trial with Stinnett in absentia. Defense counsel objected to proceeding with the trial in Stinnett's absence. The record shows that Stinnett faxed to the trial court one page of a medical record and a signed doctor's note, stating that Stinnett needed to be excused from "work/court, due to 4 rib fractures/pain" from "5/17/2021" through "5/21/2021"

In a detailed ruling on the record but outside the presence of the jury, the trial court provided a comprehensive timeline of events and its detailed observations of Stinnett's demeanor and physical abilities relevant to his motion to continue trial:

> I want to be as clear as I can on the record about this issue up to this point. This trial has already commenced. We are here. This is day two. Mr. Stinnett was present yesterday for the entirety of the day, and I want to comment on what the Court observed here in just a moment. Mr. Stinnett did come to this court and, again, I will not—nor do I know of any settlement

- 10 -

discussions that have been occurring—but I did receive a call with permission of the [S]tate from Mr. Stinnett's counsel indicating back on the week or maybe Monday or Tuesday of April 23[,] that week that Mr. Stinnett did desire a plea and asked the Court to consider waiving its traditional policy with respect to plea[d]ing and allowing him to [enter a] plea even though the case had been set for trial. I did arrange for a court reporter to be here on April 23[, 2021,] even though that was a civil court date, and we did show up to consider that plea. Again, the terms of which I'm not aware of, don't need to be aware of. However, on that day Mr. Stinnett did appear and decided that he was not going to plea. And so I reminded him that he needed to be here yesterday for purposes of moving forward with the trial. I will mention that that was some 25 days ago from the first day of trial. Mr. Stinnett on April 23[, 2021,] seemed to indicate that he had fallen off of a ladder. Quite frankly, I thought Mr. Stinnett was malingering and was putting on about his injuries, because when I watched him in the gallery that particular day he did not appear to be in any gross amount of pain nor did he walking up the stairs as the Court witnessed him coming into the courtroom. However, as we were discussing scheduling on that April 23[] day, Mr. Stinnett was grimacing and grabbing his side and acting as if his ribs were hurting. The Court did inquire as to what was wrong[,] and he said he had fallen off of a ladder. Again, I will underscore [this occurred] 25 days ago. So yesterday on day one of the trial prior to starting the trial Mr. Stinnett by and through counsel asked that this court continue the trial. And the Court did inquire from Mr. Stinnett as to whether or not during this 25 days if he had obtained any type of treatment for his alleged injuries. He indicated that he had not, as a result of multiple things. But more importantly, the Court did not find his response to be very credible nor did [the Court]—in watching [Stinnett's] his body language and demeanor—really believe that he was injured and did deny the motion to continue[,] and we proceeded with trial.

Also, I want to be very clear about this: The Court has not put on record to this point its comments as it relates to Mr. Stinnett's demeanor while in court as it relates to his injuries, but the Court closely monitored and watched Mr. Stinnett as he freely conversed with counsel; he moved back and forth in his chair at the counsel table to his left to his right; he would bend over and speak with [defense counsel] and ask him—presumably ask him questions and inform him of various things about the case in which he wanted him to ask. It seemed very clear to me that Mr. Stinnett was able to converse with counsel; that he was able to participate fully in his defense; he was able to move about the courtroom during breaks; he was able to traverse up and down the stairs without difficulty. And so I find it rather difficult to

understand that now[,] after day one of the trial[,] that he seeks medical attention when he did not need such medical attention for in excess of 25 days up to this point.

[A]lso I want to add this—again, out of the presence of the jury:  The Court gleaned from yesterday that the trial is not going very well for Mr. Stinnett at least on its face.  [Defense counsel] has done an excellent job in this trial up to this point, but the proof—particularly the recorded [interview] yesterday that was played as an exhibit—may in Mr. Stinnett's mind have been pretty damning testimony.  So I just want to indicate on the record—I'm not trying to pass judgment on this case; I haven't heard the entirety of the proof—but I do want to say that obviously it was a difficult day yesterday for Mr. Stinnett, I presume.

The trial court then contemplated Rule 43's application to this case:

[W]ell, first, the threshold consideration is I realize that this is a fundamental right for him to appear at trial.  However, in considering Rule 43, number one, the trial has already commenced in which he was present.  So I believe that hurdle has been accomplished.  And I do find that Mr. Stinnett . . . is voluntarily absent after his trial has commenced in such on his own accord, and I will underscore the word "voluntarily."  I find no reason why he could not be present for today.  Again, I truly believe it's just his play to try to continue this matter beyond the dates in which this court has set.

Mr. Stinnett, also in accordance with Rule 43, even though he is not present at this time the Court did, in fact, ask [defense counsel] to reach out to him again to make sure he understood that I expected him to be here.  [Defense counsel], I believe, has done that.  I will note as I look at what four pages have been provided to the Court as it walked in this morning, I don't know whether or not these are authentic medical records.  There's not an affidavit attached thereto.  There does appear to be what I would call or is entitled "excuse from work, school, or physical activity" wherein there's a X by a sentence that says "work/court excuse due to four rib fractures/pain."  Again, I don't know the—necessarily know if this is a true and exact copy of an authentic record.  The Court will make—just for identification will make it an exhibit so that we do have this.  It will be the next numbered exhibit.  Obviously it will not be shown to the jury, of course, but I will make it an exhibit to this Rule 43 hearing—Exhibit 1 to the Rule 43 hearing for further consideration down the road if necessary.

- 12 -

Again, in final summation I do find that Rule 43 has been satisfied in that the trial has already proceeded. [Stinnett] was present during the entirety of the first part of the trial including voir dire, jury selection, opening statements, the [S]tate's proof, and I think we have one more witness today of the [S]tate's proof and that he could have been present today absent his voluntary decision not to be present here today.

So I'm going to grant the [S]tate's motion and move forward [with Stinnett] in absentia, and we will proceed.

At the motion for new trial hearing, the trial court reiterated many of its previous findings on this issue and then provided the following remarks:

I did recall requesting specifically [defense counsel] to contact Mr. Stinnett immediately prior to the jury even arriving that morning [of the second day of trial] to just tell him to be here, he needs to be here, he needs to come. We gave [Stinnett] time to show up. He chose not to come. I believe [defense counsel] was text messaging [with Stinnett] . . . so [Stinnett] knew we were moving forward and still chose not to show up despite the fact that the Court ordered him to be here on that day. So, we continued with trial because [Stinnett] had ample opportunity to come and be here. Mr. Stinnett's from Marshall County. . . . So, it's not like he was in Davidson County and had to get here. . . . [As the State] said, after [Stinnett] was found guilty, . . . we had to continue [the] Sentencing Hearing because [law enforcement] couldn't find [Stinnett]. He did not report after being told he was convicted. So, the Court did not err, I don't believe, in denying his motion for [a] continuance.

Although Stinnett claims that medical treatment for his broken ribs was the reason for his absence the second day of trial, the record shows that Stinnett broke his ribs over three weeks prior to his trial and that he voluntarily sought medical treatment rather than attend the last day of his trial. The trial court specifically determined that Stinnett was malingering regarding his injuries, and it supported this determination with detailed findings regarding Stinnett's demeanor as well as Stinnett's ability to walk, move, and function during the first day of trial. We agree with the State that there is nothing in the record, including the "excuse" faxed to the trial court, demonstrating that Stinnett's medical condition was so severe that his absence from trial was involuntary. We also observe that the trial court complied with the procedural requirements of Rule 43. The trial court denied Stinnett's request for a continuance on the first day of trial and told defense counsel to inform Stinnett that he was required to attend the second day of trial. The court also gave Stinnett notice that if he failed to attend the last day of trial, it would continue without him. Moreover, after Stinnett was notified of his conviction, his sentencing hearing

- 13 -

had to be continued because law enforcement could not locate him. Because Stinnett made a unilateral, voluntary decision to miss the last day of trial, he waived his right to be present at his trial. Accordingly, we conclude that the trial court properly denied the motion to continue trial pursuant to Rule 43, and the denial of this motion did not violate Stinnett's constitutional rights.

III. **Sentencing.** Lastly, Stinnett contends that the trial court erred in imposing partially consecutive sentences and in denying alternative sentencing. He claims he was "not a dangerous criminal" but merely "an addict supporting his habit." He also asserts that consecutive sentencing should only be imposed when there are aggravating circumstances present, not just when there are two or more dangerous crimes committed, as in his case. The State responds that the trial court properly exercised its broad discretion in ordering a partially consecutive alignment of sentences and in denying probation to Stinnett. Because the trial court did not abuse its discretion in imposing the sentence in this case, Stinnett is not entitled to relief.

Preliminarily, we note that Stinnett, who had the assistance of counsel, failed to cite to any relevant legal authority or to any pertinent portions of the record to support his sentencing claims. Accordingly, Stinnett has waived these issues. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). In any case, we conclude that Stinnett is not entitled to relief.

At Stinnett's sentencing hearing, the State introduced the presentence investigation report, which showed that Stinnett's criminal history consisted of four Class E felonies, including statutory rape and three violations of the sex offender registry, and at least sixteen misdemeanors. In addition, Stinnett had six probation violations, including one that was pending at the time the presentence report was filed. Moreover, Stinnett was serving a probationary sentence when he committed the offenses in this case.

After considering Stinnett's criminal history, the trial court determined that the Stinnett was a Range I, standard offender and that the range of punishment for the possession of heroin and cocaine offenses in Counts 2 and 3, which were Class B felonies, was eight to twelve years with a release eligibility of thirty percent. See Tenn. Code Ann. §§ 40-35-112(a)(2), -501(c). The court also determined that Counts 4, 5, and 6 were Class A misdemeanors, which meant that they each had a maximum term of imprisonment of eleven months and twenty-nine days at seventy-five percent. See id. §§ 40-35-111(e)(1), 40-35-302(d).

Stinnett testified that he was currently serving a 210-day sentence in county jail for failing to pay child support. He claimed that he missed the second day of his trial because he went to the emergency room and his doctor, who diagnosed him with broken ribs, gave

him an excuse for court and told him not to go to court or do anything until "[May] 21ˢᵗ." Stinnett claimed that he had broken his ribs working as a painter a week or two prior to his trial date. He acknowledged that he had not sought any medical treatment until the night before his second day of his trial; however, he asserted that he went to the hospital that night because he started "hurting real[ly] bad."

Stinnett maintained that his violations of the sex offender registry occurred because the requirements "changed so much" and he "g[o]t the dates mixed up." Nevertheless, he insisted that he would be able to comply with the conditions of an alternative sentence by writing down any important dates.

Stinnett asked the trial court to send him to a twelve-month rehabilitation center in Mobile, Alabama for treatment for his drug and alcohol addiction. He admitted that for the last two years he had been addicted to "[h]eroin, meth, [and] weed" and that he routinely used a "[h]alf a gram to a gram" each day, which cost him approximately "30 bucks." He acknowledged that his drug addiction forced him to obtain money "any way [he] could," including selling the drugs at issue in this case. He also acknowledged that because of his addiction, he used his money for drugs rather than for child support. Stinnett stated that if the trial court granted him an alternative sentence, he would continue working as a painting subcontractor, earning $15 per hour.

At the conclusion of the proof, the trial court applied three enhancement factors to Stinnett's sentences. In light of Stinnett's four prior Class E felonies and "15-plus" misdemeanor convictions, the trial court found that Stinnett had "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range[,]" and it gave "tremendous weight" to this enhancement factor. See id. § 40-35-114(1). The court also found that Stinnett "before trial or sentencing, . . . failed to comply with conditions of a sentence involving release into the community" because he had violated his probation multiple times, and the court gave "tremendous weight" to this enhancement factor as well. See id. § 40-35-114(8). Lastly, the trial court determined that Stinnett "was on release for probation" at the time he committed the felonies in this case because there was "a probation violation order pending[.]" See id. § 40-35-114(13). The trial court applied the mitigating factor that Stinnett's conduct "neither caused nor threatened serious bodily injury" but gave this factor "little to no weight." See id. § 40-35-113(1).

After applying these factors, the trial court imposed a sentence of nine years with a release eligibility of thirty percent for the felony convictions in Counts 2 and 3. The court then imposed a sentence of eleven months and twenty-nine days at 75 percent release eligibility for the misdemeanor convictions in Counts 4, 5, and 6.

- 15 -

Regarding whether these sentences would be served concurrently or consecutively, the trial court found that Stinnett was "an offender whose criminal record . . . or [record of] criminal activity is extensive[,]" given his previous felony and misdemeanor convictions and his commission of the offenses in this case while on probation. See id. § 40-35-115(b)(2). The court emphasized that Stinnett had been given "multiple, multiple chances along the way" before it ordered the sentence in Count 3 consecutive to the sentence in Count 2 and ordered the sentences in Counts 4, 5, and 6 "concurrent with one another and concurrent with Count 3 but consecutive to Count 2" for an effective sentence of "18 [years] at 30 percent." It also ordered that this effective sentence would be served "consecutive to any other unexpired sentences."

Regarding whether Stinnett would be granted an alternative sentence, the trial court stated that it had considered the presentence investigation report. It also considered Stinnett's physical and mental health, including that he was forty-five years old, that he had used illegal drugs and alcohol in the past, and that he said he was sober at the time of the presentence report. The court noted that Stinnett had suffered some sort of injury, although it found that there was no good cause for the continuance of his trial given that Stinnett waited until the night before his second day of trial to seek treatment for his weeks-old rib injury. Regarding "the facts and circumstances surrounding the offense and the nature and circumstances of the criminal conduct," the court found that Stinnett "was in possession of multiple drugs not just for personal use but for resale or delivery." As for Stinnett's "prior criminal history," the court found that Stinnett had "four prior felony convictions" and "multiple misdemeanor convictions" and that "this factor . . . weigh[ed] heavily against [Stinnett]." As for Stinnett's "previous actions and character," the trial court found that Stinnett had "prior convictions for statutory rape and for multiple violations of the sex offender registry law[,]" "various misdemeanor convictions[,]" "multiple violations of probation[.]" The court also noted that "[p]robation ha[d] been tried and . . . ha[d] failed. . . . [m]ultiple times." The trial court determined that Stinnett was "high-risk [f]or reoffending" because he had "violat[ed] his probation on multiple occasions." As for whether Stinnett would "abide by the terms of probation," the court reiterated that Stinnett had "proven time and time again that if given probation, he has violated[,]" which "weigh[ed] against [Stinnett] in that regard." In considering "[w]hether the interest of society in being protected from possible future criminal conduct of the defendant [was] great," the trial court found that while it had "serious concerns" about Stinnett's "future criminal conduct[,]" it said it was unsure whether society's interest in society being protected from Stinnett's future criminal conduct was "great[,]" so it found this factor did not weigh against Stinnett. As for whether "measures less restrictive have been frequently or recently [been] applied unsuccessfully," the court stated that Stinnett's probation had been "revoked on numerous occasions" and that Stinnett currently had "a pending revocation," which "weigh[ed] against" Stinnett's current request for probation. Finally, as to "[w]hether or not a sentence of full probation would unduly depreciate the

- 16 -

seriousness of the offense," the trial court found that "it certainly would" in Stinnett's case. Ultimately, the trial court held that the "presumption of alternative sentencing" was "overcome" and that Stinnett's effective sentence of eighteen years would be "a to-serve sentence."

At the motion for new trial hearing, the trial court asserted that it had considered the appropriate factors before imposing the sentence in this case and emphasized that Stinnett's criminal history was "extensive." The court then stated, "[F]or the reasons stated on the record at the Sentencing Hearing, I stand by my ruling as it relates to consecutive sentencing."

Here, Stinnett contends that the trial court erred in imposing partially consecutive sentences and in denying alternative sentencing. In Bise, the Tennessee Supreme Court adopted "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." Id. at 708. In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.
(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Id. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401, Sentencing Comm'n Cmts. The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. §

40-35-102(1). The court must also consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C), -103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Id. §§ 40-35-103(2), (4).

First, Stinnett contends that the trial court erred in imposing a partially consecutive sentencing alignment. The Tennessee Supreme Court held that the same "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see Bise, 380 S.W.3d at 708; State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). "[T]he presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

In determining the alignment of Stinnett's sentences, the trial court found that Stinnett was an offender whose record of "criminal activity" was "extensive" pursuant to Code section 40-35-115(b)(2). The court recognized that Stinnett had been convicted of four felonies and numerous misdemeanors and had committed the offenses in this case while on probation. The trial court also stressed that Stinnett had been given "multiple, multiple chances along the way" before it imposed consecutive sentences for the felonies and partial concurrent sentences for the misdemeanors, resulting an effective sentence of eighteen years. The record fully supports the trial court's finding that Stinnett had an extensive record of criminal activity. Stinnett admitted that he was addicted to controlled substances and his criminal history includes four felony convictions and at least sixteen misdemeanor convictions. The record also shows that Stinnett was on probation at the time he committed the offenses in this case. Given the extensiveness of Stinnett's criminal record and criminal activity, we conclude that the trial court properly imposed a partially consecutive alignment of sentences in this case.

Second, Stinnett asserts that the trial court erred in denying his request for an

alternative sentence. The abuse of discretion standard, accompanied by a presumption of reasonableness, likewise applies to a trial court's determination regarding the manner of service of a sentence. Caudle, 388 S.W.3d at 278-79. Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Tenn. Code Ann. § 40-35-102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C) (2006); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Even if the defendant is considered a favorable candidate for alternative sentencing, the defendant has the burden of establishing suitability for full probation. See id. (citing Tenn. Code Ann. § 40-35-303(b)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. Tenn. Code Ann. § 40-35-303(a). However, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b) (2006), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would "'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). When determining whether to grant probation, the trial court should consider the following factors: "(1) the

defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." State v. Trent, 533 S.W.3d 282, 291 (Tenn. 2017) (citing State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)).

Here, Stinnett was not a favorable candidate for alternative sentencing because he had been convicted of two Class B felonies. See Tenn. Code Ann. § 40-35-102(6)(A). Although Stinnett was eligible for probation because each of his sentences was ten years or less, he failed to satisfy his burden of proving his suitability for probation. Moreover, the trial court's extensive findings emphasized that confinement was necessary in light of Stinnett's long history of criminal conduct, confinement was necessary to avoid depreciating the seriousness of the offenses, and confinement was necessary because measures less restrictive than confinement had frequently or recently been applied unsuccessfully to him. See id. § 40-35-103(1)(A)-(C). When determining whether to grant probation, the trial court specifically noted Stinnett's prior criminal history, his regular use of illegal drugs and alcohol, and his possession of multiple drugs, not just for personal use, but for resale or delivery. The trial court also found that Stinnett was high-risk for reoffending, as shown by his extensive history of failing to comply with community release.

In this case, the record shows that the trial court carefully considered the purposes and principles of the sentencing act and provided extensive findings to support the sentence it imposed in this case. Because the record fully supports the trial court's imposition of a partially consecutive sentences and its denial of any type of alternative sentence, we affirm the sentence in this case.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE